**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

v.   Case No. 6:23-cr-70-WWB-EJK
(Forfeiture)

**JOHN CAN UNSALAN**

**UNITED STATES' MOTION**
**FOR ENTRY OF AN ORDER FORFEITURE**

The United States respectfully moves this Court, pursuant to 18 U.S.C. § 982(a)(1) and Fed. R. Crim. P. 32.2(b)(2), to enter an order of forfeiture in an amount of $160,416,948.56, representing the amount of funds obtained by the defendant and involved in the conspiracy to commit money laundering offense charged in Count Twelve of the Indictment, which, upon entry, shall become final as to the defendant. In support thereof, the United States submits the following memorandum of law.

**MEMORANDUM OF LAW**

**I.   Statement of Facts**

1. On April 13, 2023, a twenty-two count Indictment was returned. Count Twelve charged the defendant with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Doc. 1. The Indictment also contained forfeiture allegations, which notified the defendant that the United States, pursuant to 18 U.S.C. § 982(a)(1), would seek to forfeit any property, real or personal, involved in such offense, or any property traceable to such property. *Id.* at 2.

2. On October 3, 2023, the United States and the defendant entered into a plea agreement. Doc. 64. In paragraph nine of his plea agreement, entitled

"Forfeiture of Assets," the defendant agreed that he is liable for a forfeiture judgment in the amount of $160,416,948.56.  *Id.* at 6.   He further admitted that as a result of his acts and omissions, the proceeds he obtained from the conspiracy were transferred to third parties and could not be located by the government upon the exercise of due diligence.  *Id*.

3. On October 3, 2023, the defendant pled guilty to Count Twelve of the Indictment and the Court accepted the plea of guilty and adjudicated the defendant guilty as to Count Twelve.   Doc. 67.   The defendant is scheduled to be sentenced on January 16, 2024.   Doc. 69.

## II. Applicable Law

The Court's authority to order forfeiture of property for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), is found in 18 U.S.C. § 982(a)(1), which provides for forfeiture of any property, real or personal, involved in such offense, or any property traceable to such property.

Pursuant to Rule 32.2(b)(2), because the United States could not locate all the specific property constituting or derived from the proceeds the defendant obtained from his conspiracy to commit money laundering, the United States seeks an order of forfeiture against the defendant in the amount of proceeds and funds involved in the money laundering conspiracy, which he obtained from the conspiracy. Indeed, for cases in which a defendant no longer has the actual dollars or property traceable to proceeds in his/her possession, or the government cannot locate those assets, the obligation to forfeit simply

2

takes the form of an order of forfeiture in favor of the United States. *See United States v. Padron*, 527 F.3d 1156, 1161-62 (11th Cir. 2008).

Rule 32.2(b)(1) provides that the court must determine the amount of money that the defendant will be ordered to pay. The Court's determination may be based on evidence submitted by the parties and accepted by the Court as relevant and reliable. Fed. R. Crim. P. 32.2(b)(1)(B).

### III. Factual Basis

In the Factual Basis of the Plea Agreement, which shall be incorporated herein by reference, the defendant admitted the following:

**Background and Total Value of Sanctioned Transactions
for which UNSALAN is Responsible**

Metalhouse, LLC was registered in the State of Florida as a Limited Liability Company on February 2, 2014, and listed its registered agent as JOHN CAN UNSALAN ("UNSALAN"), who also served as an Authorized Member for Metalhouse. Before UNSALAN's arrest in April 2023, Metalhouse, which was located within the Middle District of Florida, operated in the steel industry by trading and distributing raw steel-making materials globally.

Between 2018 and 2021, UNSALAN, both in his individual capacity, and through Metalhouse, which he controlled, willfully helped carry out and facilitate business transactions that Metalhouse engaged in with companies that UNSLAN knew were owned and controlled by Sergey Kurchenko, an oligarch located in Russia who had been designated by the Treasury Department's Office of Foreign Assets Control ("OFAC") at the time as a Specially Designated National ("SDN"). More specifically,

3

UNSALAN, his associate Sergey Karpushkin ("Karpushkin"), and others conspired to orchestrate and carry out a scheme to violate the International Emergency Economic Powers Act ("IEEPA") by willfully conducting monetary transactions with and for the benefit of Kurchenko and entities owned and controlled by Kurchenko and willfully receiving metal products from Kurchenko and entities that UNSALAN knew were owned and controlled by Kurchenko, who UNSALAN knew had been designated by OFAC as an SDN, without first having applied for and received a license from OFAC.  UNSALAN and Karpushkin both knew that an OFAC license was required and that they did not have such license to transact with Kurchenko and companies owned and controlled by Kurchenko. During the relevant period of on or about July 27, 2018, to on or about March 11, 2021, UNSALAN and Metalhouse provided funds totaling $157,189,912.09 to Companies A and B below pursuant to metal transactions.

**Companies A and B**

One of these entities owned and controlled by Kurchenko with which UNSALAN and Karpushkin conducted metal transactions was a business incorporated in Hong Kong ("Company A") that maintained a bank account in Saint Petersburg, Russia. Another entity owned and controlled by Kurchenko with which UNSALAN and Karpushkin conducted business transactions was a business incorporated in Cyprus ("Company B"). UNSALAN and Karpushkin both knew that Company A and Company B were owned and controlled by Kurchenko, whom both UNSALAN and Karpushkin referred to as "Mr. K."

**UNSALAN and Karpushkin Were Willfully Doing Business with Company A and Company B, Despite Knowing that They Were Owned and Controlled by**

**Kurchenko**

In approximately January 2019, UNSALAN, Karpushkin, and others known and unknown to the United States traveled to Moscow, Russia, and participated in an in-person meeting with Sergey Kurchenko about the business relationship and current balances of funds owed between Metalhouse, UNSALAN, and Karpushkin, on the one hand, and Kurchenko's companies, including Company A and Company B, on the other hand.

In or about August 2020, Karpushkin emailed an individual with the initials A.P. on an encrypted messaging service, explaining that Karpushkin was working with UNSALAN, and that they were purchasing goods through Company A from a "Mr. K," *i.e.*, Kurchenko, who owed them at least $21 million:

> Regarding our conversation yesterday, the company from which I am working with Mr. K is called Metalhouse. The front man of the company is Mr. Can[1] Unsalan. We are partners in this project. Mr. K officially confirms there is an unpaid balance of 21 million dollars (See their official data further in the text). In fact it is a little more but I suggest starting with their figures. We have an agreement that they will be paying one million dollars to us monthly (see the document below). They have been violating the agreement for twelve months already. I need to understand if it is realistic to return part of it / everything and how much the services will cost.

The words "front man" were in English while the rest of the message was in Russian. Karpushkin then sent A.P. two documents, one of which was a September 2019 addendum to a contract between Company A and Metalhouse.

On or about this same date in August 2020, Karpushkin sent via electronic message a copy of a May 22, 2020 letter from Metalhouse's General Manager and In-

---

[1] "Can" is UNSALAN's middle name.

House Counsel to Company A with a carbon copy directed to "Sergey Vitalievich Kurchenko." The letter sought to reduce the amount Company A owed to Metalhouse under the same underlying contract.

By in or about February 2021, Company A's outstanding balance with Metalhouse, *i.e.*, Metalhouse's total payments to Company A minus the value of goods shipped by Company A, had reached $26 million. On or about February 27, 2021, UNSALAN messaged a Russian national business associate, stating "I need your help because I have receivable from kurchrnko [sic] 26m$ and can't get anything do you know any one Strong in government to push him." Less than two weeks later, on or about March 11, 2021, Metalhouse forwarded to Company A personnel a table that showed Company A owing Metalhouse a balance of over $26 million.

UNSALAN engaged in these transactions with Company A despite knowing that the ultimate beneficiary of these transactions was Kurchenko, who had been designated as an SDN. For example, in or about August 2019, well after sanctions were imposed against Kurchenko on or about July 30, 2015, and Gaz-Alyans and Vneshtorgservis on or about January 26, 2018, UNSALAN emailed Metalhouse employees about Metalhouse's outstanding balances with, among others, Gaz-Alyans and Company A. In the e-mail, UNSALAN stated that the price of short billets, or semi-finished steel that is stored in rectangular bars, had been previously agreed upon with an officer appointed by Company A and that Kurchenko was now changing his mind about that price. He said that "[i]f Mr. Kurchenko is not agreeing on the price of short billets then he would have come to Istanbul himself and market the cargo himself to us." Likewise, in or about

6

November 2019, UNSALAN sent a message to a business associate in which he stated that "We still do business with Kurchenko and we give chance to everyone." Similarly, in or about October 13, 2021, UNSALAN stated in an electronic communication to a business associate, in Turkish, that "[t]his time the last cargo from Kurchenko was loaded to you."

UNSALAN also knew that Gaz-Alyans and Company B were beneficially owned and controlled by Kurchenko. For example, in a message sent to a business associate on or about July 30, 2020, UNSALAN stated that "[a]s far as I know [your company] work[s] with Gaz All [Gaz-Alyans]. We work too." UNSALAN then sought to purchase pig iron from the business associate, despite knowing that the source of the pig iron was Gaz-Alyans. In an electronic communication he sent to a business associate on or about October 1, 2021, UNSALAN stated in Turkish that Company A, Company B, and Gaz-Alyans were "Kurchenko's companies."

**Between July 2019 and June 2020, UNSALAN/Metalhouse Willfully Conducted over $43 Million in Deals with Kurchenko via Company B**

In or about June and July of 2019, Metalhouse entered into two contracts to buy metal products from Company B. Pursuant to these contracts (the "Company B Contracts"), between in or about July 2019 and in or about September 2019, Metalhouse paid Company B $10.53 million, and Company B delivered to Metalhouse three shipments totaling 19,950 tons of steel billets at a contracted price of $385 per ton, for a total value of $7.68 million. In or about September 2019, Metalhouse and Company B entered into an addendum to the Company B Contracts, signed by

7

UNSALAN in his capacity as Director of Metalhouse, confirming that, as of September 12, 2019, Company B owed Metalhouse a balance of $2.84 million under the contracts.

Between in or about September 2019 and in or about April 2020, Metalhouse and Company B entered into at least fourteen purchase orders through which Metalhouse agreed to purchase an additional $34 million in metal products from Company B, including steel billets, pig iron, and wire rods. Pursuant to these purchase orders, between on or about September 19, 2019, and in or about June 2020, Metalhouse wired over $33.5 million to Company B. Company B, in turn, shipped a large number of metal products to Metalhouse. UNSALAN and Metalhouse made these payments and received these goods from Company B despite knowing that Company B was owned and controlled by Kurchenko, an SDN.

In a series of encrypted messages sent between in or about September 2020 and in or about July 2021, UNSALAN and a person associated with Kurchenko who acted as Kurchenko's intermediary (the "Kurchenko Intermediary" or "A.K.") repeatedly referred to Kurchenko both by name and as "Mr. K." In a message on or about April 6, 2021, UNSALAN stated that there were rumors "[t]hat Mr K [*i.e.*, Kurchenko] lost everything" and that "[w]e propose him to pay 1.9 million usd on behalf of [Company B] on April 19 as he promised . . . . Please let me know about payment for [Company B] . . . [a]s he promised." A.K. responded, "Ok, will ask Mr. K also about it." Similarly, on or about April 24, 2021, UNSALAN messaged A.K. to explain that "I'm expecting money [from Kurchenko], we paid you money, you got money and you didn't deliver products[.] [T]here are two solutions: 1) You pay money back 2) you load cargoes. Now you are

8

delayed and we don't believe you can produce steel anymore, so we want option 1," *i.e.*, payment of the $1.9 million.

Similarly, in a September 2019 e-mail from UNSALAN to Karpushkin and others, UNSALAN stated that "In the meeting with Mr. K we agreed for balance [$]19'400'000 including [Company B] + [Company A] VS METALHOUSE + [Company A] VS [another company owned and controlled by UNSALAN] + DEMURRAGES." Elsewhere in the chain, in a message on which Karpushkin was copied, UNSALAN wrote "Long story short unless all numbers showing what we agreed with Mr. Kurchenko we will not sign anything."

### UNSALAN and Karpushkin Jointly Participated in the Transactions with Kurchenko Entities and Shared in Metalhouse's Profits

Between approximately August 21, 2019, and approximately July 7, 2020, Metalhouse agreed to seven purchase orders with Company A and twenty-one purchase orders with Company B. The Company A purchase orders were worth an approximate total of $9.9 million, while the Company B purchase orders were worth an approximate total of $53.1 million. UNSALAN signed each of the purchase orders, and Karpushkin was included in emails pertaining to each of these orders.

For example, on or about September 17, 2019, a Company B representative emailed UNSALAN and Karpushkin regarding their purchase of 14,000 metric tons of steel billets from Company B, stating "Dear John / Sergey, Please find attached new PO [purchase order] for 14,000 MT of Steel Billets countersigned by us." This email attached a purchase order bearing signatures and stamps from both Metalhouse and Company B memorializing the transaction.

As another example, on or about November 12, 2019, a business representative sent a purchase order to both UNSALAN and Karpushkin, in which Metalhouse had agreed to purchase $1,560,000 worth of wire rods from Company A.

In addition, on or about December 28, 2019, Karpushkin sent an email to Company B representatives, copying UNSALAN, among others, in which Karpushkin stated, "[a]s agreed earlier please find attached draft of the new PO [purchase order] for 10000 mt [metric tons] of pig iron out of January production. . . . If you have any remarks please let us know." The email attached a purchase order proposing that Company B sell $2,900,000 worth of pig iron to Metalhouse.

From in or about August 2017 to in or about January 2020, UNSALAN and Karpushkin sent each other several "profit sharing" spreadsheets. For example, in an August 2017 email titled "volgobalt 214 profit-," Karpushkin told UNSALAN, "I see our (you + me) profit, which is 50% from total net profit in amount of 28,803.26 USD, right? I assume we need to share 2846.38 mt * 5 USD/t = 14,231.9 USD with the guys and only balance amount of 14,571 .36 is actually our (you + me) real profit."

Similarly, in or about October 2019, UNSALAN sent to Karpushkin a spreadsheet titled "PROFIT CALCULATIONS / SERGEY K[ARPUSHKIN] – METALHOUSE." The first workbook within the spreadsheet, labeled "TOTALS," had a chart with three columns: "Vessel," "Product" and "Total." The "Total" column listed the dollar value of each shipment. The bottom of the spreadsheet then listed a total dollar value which appeared to be the total profit to be shared by Karpushkin, UNSALAN, and another co-conspirator. The second workbook within the spreadsheet, labeled with the name of a

10

different trading company associated with Kurchenko, had a similar three-column chart. Below the chart, the spreadsheet stated the following:

| Outstanding Credit in RuVi Trading Group SRO | $ (7,045,000.00) |
|---|---|
| 33% SERGEY KARPUSHKIN | $ (2,324,850.00) |
| 33% UNSALAN | $ (2,324,850.00) |
| 33% MESCIER | $ (2,324,850.00) |

**UNSALAN was Knowledgeable of the U.S. Sanctions Regime**

UNSALAN and Karpushkin expressly discussed generating false and misleading certificates for sanctioned goods expropriated by the Russians from Ukraine that would suggest that the goods, in fact, originated in Russia. Specifically, on or about July 15, 2017, UNSALAN forwarded to Karpushkin an e-mail inquiry from a bank indicating that a letter of credit would likely be issued for a particular transaction so long as it did not involve sanctioned goods ("Hi John . . . I need to make you aware that any [letters of credit] involving shipments from or to Russia must be reviewed and approved by our Trade Controls area . . . I do not anticipate any problems as long as the transaction does not violate any current sanctions."). UNSALAN further indicated to Karpushkin that to bypass this issue, the supplier of the goods would need to doctor the certificates for the goods:

> We will declare the goods are made in Russia. Which mill will issue the MTC ["mill test certificate"] in case bank is asking for it? If it's Yankiyeve Iron and Steel Works Public Joint Stock Company (PJSC) – [it] means showing Makeyvka, do they have alternative way to provide MTC printed out by another mill in Russia.

Yanikiyeve (Yenakiyeve) and Makeyvka (Makiivka) are both located in the sanctioned Donetsk region of Ukraine. Karpushkin responded by stating that if this was for wire rod

11

coils, he would need to "ask the guys," referencing the generation of false mill test certificates.

UNSALAN admitted to FBI agents in a January 11, 2022 interview that he subscribed to a monthly OFAC e-mail with updates to the sanctions list and that he checked the OFAC website for businesses and persons Metalhouse wanted to do business with, and for their beneficial owners, where he knew them). UNSALAN further admitted in interviews with the FBI, including in an April 14, 2023 interview at the Orlando International Airport, that he knew that Kurchenko was sanctioned by OFAC.

At all times relevant to the Indictment, UNSALAN knew that no individual or entity had obtained the necessary license or authorization from OFAC to engage in the above transactions with Kurchenko and entities owned and controlled by Kurchenko.

## UNSALAN and His Company, Metalhouse, Received $160,416,948.56 in Proceeds from the Offense

Pursuant to the conspiracy, between July 2, 2018 and March 18, 2021, UNSALAN and his company, Metalhouse, received a total of $160,416,948.56 in proceeds from third-party purchasers as a result of the sale of the goods acquired from the unlawful transactions with Company A and Company B. UNSALAN used most of these proceeds to pay for the metal products that he was purchasing from Company A and Company B, but he also retained millions of dollars in profits for his own personal use and to expand his business assets and opportunities.

IV.   **Conclusion**

WHEREFORE, the United States respectfully requests that this Court enter an Order of Forfeiture for the $160,416,948.56 in funds and proceeds involved in the

money laundering conspiracy that the defendant obtained as a result of the conspiracy, pursuant to 18 U.S.C. § 982(a)(1) and Rule 32.2(b)(2), Federal Rules of Criminal Procedure.

The United States further requests that, because the $160,416,948.56 in funds and proceeds were dissipated by the defendant, the United States may seek, as a substitute asset, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1), forfeiture of any of the defendant's property up to the value of the proceeds obtained.

As required by Rule 32.2(b)(4)(B), the United States further requests that the Court include the forfeiture when orally announcing the sentence, and include the forfeiture order in the judgment. *See United States v. Kennedy*, 201 F.3d 1324, 1326 (11th Cir. 2000) and Fed. R. Crim. P. 32.2(b)(4)(A) and (B).

    Respectfully submitted,

    ROGER B. HANDBERG
    United States Attorney

By:    *s/Jennifer M. Harrington*
    JENNIFER M. HARRINGTON
    Assistant United States Attorney
    Florida Bar Number 0117748
    400 West Washington Street, Ste. 3100
    Orlando, Florida 32801
    (407) 648-7500 – telephone
    (407) 648-7643 – facsimile
    E-mail: jennifer.harrington2@usdoj.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 26, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Vincent A. Citro, Esquire
Matthew P. Ferry, Esquire

                                              *s/Jennifer M. Harrington*
                                              JENNIFER M. HARRINGTON
                                              Assistant United States Attorney