UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JOHN CAN UNSALAN,

        Defendant.

_____/

CASE NO. 6:23-cr-70-WWB-EJK

## JOHN CAN UNSALAN'S SENTENCING MEMORANDUM

John Can Unsalan, by and through his undersigned counsel, respectfully submits this sentencing memorandum to aid the Court in fashioning an appropriate sentence.

### A.   INTRODUCTION

As detailed in the Presentence Investigation Report ("PSR"), Mr. Unsalan had a difficult childhood. His family was poor, and his mother and father worked away from the home for long periods of times just to earn enough money to make ends meet. His grandmother raised him and did the best she could in a household where the roof leaked, soot from the fireplace filled their lungs, and the bitter cold consumed the house during several months of the year.

With the best of intentions in mind, John's parents verbally and emotionally abused him, surely with the hope that their parenting techniques would develop a drive in John to escape the poverty into which he was born. That meant when John's parents were home, they would discipline him by depriving him of human contact and emotional connection. He would be ignored, not spoken to, and confined to his room. John's parents' battle with alcoholism and their labor under with the yoke of debt left indelible impressions on John's

psyche that led to the man in one way ably described in the many character letters submitted to this Court and in the other way described in the indictment, a portrait of the worst time in his life.

The lifetime that existed before the indictment reveals that John came to the United States, abandoned his given name to fit in more easily, and worked manual and menial labor jobs before starting his own business in scrap metal. His meager earnings allowed him to start a life with his wife, which resulted in their daughter being born in 2007. Ultimately, John's business partner defrauded him and left him with the business debt. The horror of the childhood that John hoped to escape imprisoned him, his wife, and their infant daughter. Determined to not let his family know the poverty he was born into, John worked in the gig economy until 2014, when he fully leveraged his finances and contacts in the steel industry to re-enter the steel trading business.

Two years into his renewed venture, John studied hard and worked with immigration authorities to become a United States citizen in 2016. In John's oath to become a citizen he swore to "…bear arms on behalf of the United States when required by the law; that I will perform noncombatant service in the Armed Forces of the United States when required by the law; that I will perform work of national importance under civilian direction when required by the law…" Most *jus soli* and *jus sanguinis* citizens never take such an oath.

Despite his childhood vision of "making it," trying to earn an income and provide for his family did not come easy. The steel industry is rife with corruption and organized crime. John knew the only way to succeed and provide for his pregnant wife, their daughter, and soon-to-be-born son was to buy steel from those sanctioned, that is commit

a political crime.[1] And once he went down that path, the fear of bearing the yoke of debt that had haunted him throughout his life caused him to work tirelessly to enrich himself. No amount of money was enough. The weight of the stress that the outward signs of wealth put on him drove him into the alcoholism that defined his childhood.

John has pleaded guilty to conspiracy to commit money laundering, with violating sanctions laws as the specified unlawful activity. He acknowledges that he engaged in serious criminal conduct, and he does not seek to excuse his actions in any way. He also recognizes now how arrogant and misguided he was violating the sanctions laws in ways that seem unfathomable in hindsight. John deeply regrets his acts and accepts responsibility for them. This will be his last encounter with the criminal justice system.

Simply put, this case involves a brilliant person with a tenacious work ethic and drive to succeed. It involves a person who did good with his talents and ill-gotten gains. It involves a person who is tormented by his past, his alcoholism, and perpetuating the cycle of neglectful parenting that his children now must endure. This case involves a person who has been broken. But this is not all. The letters in support of John evidence that this case is about a person who must pay for his crimes but deserves another chance. Those people whose lives he touched have attested to John's core goodness and kind heart.

---

[1] In the detention hearing the government advised the Court that violating the International Emergency Economic Powers Act ("IEEPA") was "a unique charge. It's not one that exists in other countries, and because of the dual criminal issues," the government could not extradite John from another country. IEEPA violations are *malum prohibitium* crimes.

**B.**    <u>MEMORANDUM OF LAW</u>

John is a non-violent, criminal history category I offender,[2] who has accepted responsibility for the crimes he committed. Based on the factors sets forth in 18 U.S.C. § 3553(a), many compelling reasons exist that justify a sentence well below the advisory Guidelines range. In the PSR, the U.S. Probation Office recognized there are grounds for a variance. Reasons for a downward variance include:

1.  John has spent more than one year in pretrial detention at the Orange County jail. For breakfast, he has been fed cereal that ranged from 110 to 120 calories. For lunch and dinner, he has been fed kosher pasta products that averaged 200 calories. The U.S. Food & Drug Administration recommends men consume 2,000 calories a day.

2.  A survey of cases involving sanctions violations reflect variances below the guidelines even though defendants in those cases did things far worse. Two relevant cases involve U.S. government officials, discussed *infra*.

3.  John is a criminal history category I offender.

4.  John has learned his lesson, seeks help with his alcohol addiction, and desires to be present in his children's lives. John realizes that he is not as smart as he thought he was and that what he did was a crime. He has family and community

---

[2] The affray charge in John's past involved the intersection of his wife having difficulty giving birth to their daughter and a communication barrier between the Unsalans and the medical staff. Ultimately, John entered a nolo contendre plea and was sentenced to one year of probation, which was terminated early after John satisfied his conditions of probation. Even though the Court withheld adjudication of guilt, John is ineligible for the first time offender reduction pursuant to 4C1.1.

support to assist his reentry into a law-abiding life. His life experiences led him

to believe that this political crime was harmless, but he now knows better.

In addition, the government intends to file a motion, pursuant to USSG § 5K1.1, to reduce John's sentencing guidelines range because John has cooperated with authorities. That cooperation led to an indictment that U.S. Attorney General Merrick B. Garland announced to the world. *See* https://www.justice.gov/opa/pr/task-force-kleptocapture-announces-array-new-charges-arrests-and-forfeiture-proceedings (last visited April 9, 2024). "In the Middle District of Florida, a grand jury returned an indictment charging Sergey Vitalievich Kurchenko, a sanctioned pro-Russian Ukrainian oligarch, in a years-long scheme to violate and evade U.S. sanctions by receiving funds from and doing approximately $330 million in business with U.S. persons." *See id*.

Finally, regardless of the term of imprisonment this Court imposes, the Court was required to award $160,416,948.56 in forfeiture to the government. Dkt. 77; *United States v. Hernandez*, 803 F.3d 1341, 1343 (11th Cir. 2015); *see also United States v. Waked Hatum*, 969 F.3d 1156, 1166 (11th Cir. 2020) (permitting substitute assets where the defendant cannot satisfy the award of forfeiture to the government). Forfeiture is different from restitution because it is considered punishment for committing a crime. *See United States v. Bajakajian*, 524 U.S. 321, 328 (1998).

It is statistically impossible for John to satisfy the government's award during his lifetime. Felons already face significant bars to gainful employment. *See, e.g.*, Binyamin Appelbaumfeb, *Out of Trouble, but Criminal Records Keep Men Out of Work*, N.Y. TIMES, Feb. 28, 2015, available at https://www.nytimes.com/2015/03/01/business/out-of-trouble-but-criminal-records-keep-men-out-of-work.html (last visited April 9, 2024); Paul Heroux,

*Keeping Felons From Earning a Living Doesn't Make us Safer, Only Poorer*, THE GUARDIAN, Mar. 31, 2015, available at https://www.theguardian.com/commentisfree/2015/mar/31/keeping-felons-from-earning-a-living-doesnt-make-us-safer-only-poorer (last visited April 9, 2024) (discussing felons in Florida's economy). Further, the government will pursue Mr. Unsalan until after his death to recover this award, despite knowing there is little chance the Unsalans will afford the government's $160,416,948.56 award.

In other words, while the time in custody is finite, the sentence to carry the yoke of debt around his neck will be a lifetime sentence for John. Given the analysis of the factors more specifically set forth below, John respectfully requests a sentence of 46 months, as that sentence is "sufficient, but not greater than necessary" to meet the 3553(a) factors.

1. **18 U.S.C. § 3553(a)(1), the nature and circumstances of the offense**

The law requires that, in fashioning an appropriate sentence, courts should "attempt[ ] to understand (as best one can) what set a defendant upon [an] illegal course." *United States v. Blake*, 89 F. Supp. 2d 328, 332 (E.D.N.Y. 2000). While this does not excuse John's conduct as a moral matter, as a legal matter Section 3553(a) makes that context relevant in determining his sentence. *See, e.g., United States v. McCormick*, No. 3:15-cr-00009, 2017 U.S. Dist. LEXIS 17177 at *32 (M.D. Tenn. Feb. 7, 2017) ("The context in which the offense took place indicate [the defendant] was unusually influenced by a number of factors, including untreated mental health issues (depression, anxiety, and a 'maladaptive' desire to please) . . ., and other issues. While these circumstances do not excuse [the defendant's] conduct, they do help to explain it").

It is beyond peradventure that conspiring to commit money laundering with a sanctions violation as the specified unlawful activity is a serious offense. In sum, John bought steel products from a sanctioned Russian oligarch, roughly the equivalent of an Italian Cosa Nostra member – a gangster.  John significantly profited from committing this crime at the expense of thinking why the government saw fit to sanction the oligarch in the first place. What John did was illegal and violated the laws of his adopted home, and he accepts responsibility for his acts without excuses.

However, the defense seeks the Court's understanding about John's state of mind. John grew up in Turkey and knew Russians most of his life. Because of the internationally significant strait in Istanbul, international commerce with people throughout the world, including Russians, was common. Russians dominated the steel scrap trading business and were John's only supplier very early in this career. Russians so dominated the market that Turkish and Swiss banks would lend credit more easily if you bought from reliable Russians. Pursuing those relationships led John to meet and work with co-conspirator Sergey Karpushkin.

The Court is already aware of the yoke of debt that followed John throughout his life and that motivation offers the Court insight into the significant difference between sanctions violators that act against the interest of the government and John's case. Although admittedly illegal and improper, as the Court engages in the nuanced evaluation of the nature and circumstances of the offense, the defense respectfully submits that, as further discussed below, John's conduct falls toward the lower end of the universe of sanctions offenses and weighs in favor of a downward variance pursuant to § 3553(a).

2. **18 U.S.C. § 3553(a)(1), the defendant's history and characteristics**

In arriving at a sentence that is "sufficient but not greater than necessary" to comply with the purposes of sentencing, the Court "should consider, among other factors, the nature and circumstances of the offense and *the history and characteristics of the defendant*." 18 U.S.C. § 3553(a)(1) (emphasis added). Adding this in § 3553(a), Congress rejected the inane argument that the indictment reflects the defendant's true character.

An examination of John's personal history and characteristics reveals that a significant downward variance is warranted. This is evidenced by information provided to the Court about John's background, the letters of support from family members and friends, and importantly, from John's statement to the Court that will be made at the hearing. We have already addressed John's upbringing and what led him here, and the Court will hear from John at sentencing. Accordingly, we will focus on the character letters, which prove that John is loving, charitable, and defined by much more than the crime he committed when he thought no one was looking.

In a letter from Mayor Ahmet Okuzcuoglu, from the Turkish city Alaşehir, John was well described.

> John [ ] is a well-respected member of one of our city's long-standing families. He has demonstrated his kindness as a family man and philanthropist. Our community holds him in high esteem for his support of numerous social and cultural events, including his sponsorship of our city's football team. [A]s mayor and an elder, I greatly value his trustworthiness and success. I can tell you that John [ ] offers monthly food aid to families in need, provides free scholarships to many students, in clothes children from poor families during the holy holidays and New Year's Eve. He is a kind and generous person who loves doing good for others.

Huseyin Soygur, Chairman of the Board of Directors of Alasehir Chamber of Commerce, wrote about how John helped family members pay off debt, buy houses back that were in default, and provided aid to children whose father's abandoned them.

Many letters describe how John helped family members. Munibe Sarica, John's aunt, described how the family lost their home and car because her husband's pension was not enough to provide for the family.

> John [ ] paid our debts and bought our house and car again and gave us our house and car that were lost due to debts… He has given scholarships to many university students. He is a good family man. He is a good husband. He has made every effort to ensure that his children receive a good education period he also supported his son's education and covered his educational expenses. My daughter is a single parent to her child. In this process, John [ ] has helped my daughter, who is his cousin, in every way he could, provided her with a job...and gave her a house to live in with her son.

> That cousin is Zeliha Sarica, who raised her son after her husband abandoned her.

> I have been met with significant psychological and mental challenges during this process. I don't know how I could have overcome this process without the help and support of [John]. Providing me with job opportunities, meeting every need of my child, ensuring that he gets an education in a good school and buying me a house or some of the countless help he has given me. Due to this unfortunate incident, I lost my job at my brother's company. However, my brother, [John], has not only provided support to me and my family but also assisted many families in need in Alasehir.

In a letter from Abidin Ural, a Gypsy, he describes John's charity. Throughout Europe and Asian, Gypsies are associated with poverty, blamed for high crime rates, and accused of antisocial or inappropriate behavior. John provided Ms. Ural and her grandchildren with food and paid for schooling and clothing for Ms. Ural's minor grandchildren when their own father neglected them. John saw the grandchildren growing up in a life that mirrored his own and used his funds to help them avoid that painful life.

Arda Mentese discussed how John helped him rebuild his family's financial security after a bankruptcy. As a result of John's financial assistance, "we were able to keep our family together and my daughters were able to finish university."

Another Ural family, Funda and Sukru, had a community elder refer them to John for help. The Urals are poor, and John encouraged family growth and gave the three children gifts and clothes for every religious holiday.

Azra Diner described how John helped her escape growing up in a household with "a schizophrenic father and drug addicted mother." John and his mother "showed that there is love and compassion in this world and their help always made me feel better." With John's help, Azra was able to attend a good high school.

In an ironic twist of fate, John helped Dondu Ozzeybek, her husband, and their two children avoid starvation and growing up without an education. He even covered the schooling expenses for a relative's son, whose father was incarcerated. "His kindness and compassion have truly made a difference in our lives, and he is both respected and loved."

This was not an isolated act of kindness to the children of those incarcerated. Gulsen Altindas's son was incarcerated for drug offense and his wife left Ms. Altindas to care for her two-year old grandchild. "2 years ago, our neighborhood headman said that a philanthropic businessman was dressing children… John [ ] was also in the store, he approached me with a benevolent attitude and took care of my granddaughter, loved her, then took her on his lap and gave her an extra baby toy." Ms. Altindas recounts how John told store employees that they were to contact him if Ms. Altindas needed anything for her granddaughter. When the kindergarten attempted to refuse to accept Ms. Altindas's

granddaughter, John "took care of my granddaughter and she went to kindergarten thanks to him. He is a very decent and kind person."

Murat Pulat was imprisoned and unable to provide for his wife and daughter. While incarcerated, John "provided food aid to my wife Fadime and my daughter Eylul Pulat, and cover the education expenses of my daughter so that she could continue her education."

John helped Aysegul Kocaturk, an aspiring preschool teacher, afford her tuition and provided her a computer and cellphone to attend schooling during the pandemic. John helped her gain independence by also giving her a job and paying her a wage rather than insisting the work was a way to repay John for his generosity. Yaren Yildiz echoed Ms. Kocaturk's experience with John. John enrolled Mr. Yildiz in college and paid for him to complete his studies.

When the Alasehir Mehmet Akif Ersory secondary school needed a classroom renovated, computers, and a bar code scanner for inventory control, John took care of those needs. "On November 26, 2022, thanks to John [ ], we were able to present the renovated computer classroom to our students. John [ ] is a helpful and kind individual who is always willing to assist with requests." That renovated classroom will serve the needs of Turkish children for decades to come.

Mistafa Kocaturk remembers when John built a library in his Turkish village, where children now study. John also bought his daughter a computer for school and paid for her education, giving her the keys to a better life. Along those lines, Nevin Soyumert explained that John provided educational scholarships to "numerous young people" and had positive impacts on both their academic and personal lives. "He is a person who makes

a positive impact wherever he resides and makes a lasting impression on those he encounters."

Nuray Eraslan, a stranger to John, approached him when she needed financial assistance with raising her teenage boys. John "generously covered my children's educational expenses, as well as their needs for clothing and nutrition, for an uninterrupted four-year period." Ms. Eraslan went on to say "John is a well-liked person in his hometown, who helps those in need as much as he can, and is sensitive about education, helping and supporting children. His help is a hope for many unemployed women and mothers like me." John went on to provide food and financial security for Rahime Arslan, a widow, and her four children for four years. Ms. Arslan described John as "a philanthropist who is loved in my neighborhood and known for his kindness and support for children and women."

Erkan Kurt wrote about how John saved his ability to earn a living after Mr. Kurt's leg was amputated. Mr. Kurt could not afford a prosthetic. After John learned of Mr. Kurt's physical and psychological trauma from the loss of his leg, John "covered my expenses during the whole process of prosthetic leg and its fitting, took care of me and I was able to walk with both feet again. I can go wherever I want, I have re-entered the working life, in other words, I have reconnected to life."

Again, mindful of the painful memories of his youth, John helped keep children warm. In a letter from Unal Yapici, a director for a school for orphans and disadvantages children, the Court will read that John "has been generously providing coal for our hearing needs and contributing to our nutrition since 2019."

Ahmet Unal, a young landscaper, met John and leaned on him as a mentor. John assisted Ahmet with his education and career and hosted his engagement party. So that Mr. Unal's father, Suleyman, did not have a suit for the party, so John bought him a suit to wear for his son. Ahmet said, "I am inspired by John['s] help and I try to help others within my financial means, just as I was helped before."

John's cousin, Gokce Cevikoglu, described him as "an honorable individual dedicated to his family." John's altruism included those in his extended family, like the babysitter Saodat Hursanova. John paid for two years of her university tuition. When talking about John, Ms. Hursanova said "He is a friendly, sincere, and altruistic individual who supports others in need to the best of his ability. Not only is he kind and loving to his family, but he also prioritizes spending time with them, playing games with his son Alp John, no matter how far or long he has traveled, or how tired he may be."

Through community organizations, John has helped his mother's commune grow and afford social and education development to women and children in his hometown, according to Selen Okuzcuoglu. Sevket Comcomoglu, a community leader in Turkey, recalls when he and John "organized and distributed food aid to 280 underprivileged families and 15 neighborhoods in our city for 67 months." Twice a year John provided clothing to more than one hundred underprivileged children.

Throughout the letters of support a theme emerges about John helping children. Zugal Topal was 9 years old when she met John. Ms. Topal was born out of wedlock and therefore an outcast relegated to an orphanage. John sent Ms. Topal and her friends to a prestigious high school. "In that dark and unknown period of my life, their love and support became a light for me and a hope for the future… After graduating from high

school, [John] guided and helped me to become a civil servant and to set up my own home."

Uskudar University, Department of Social Services, Professor Dr. Ismail Baris wrote how John supported orphaned children. John paid for 5 children to get educated at that institution and built a hospice for abandoned babies. On the other end of that spectrum, Niko Atananyadis discussed how John visited the elderly and ensured that a local church and its foundation were financially sound by donating money to them. John even helped Osanna Mentese, who describes being ethically Armenian. Despite the long racially feud between those of Turkish and Armenian descent, John helped the Mentese family.

Perhaps the most striking to the undersigned was the letter from Yagmur Ozbilen, who lost family members during the earthquake the struck Turkey in 2023, lost his life's savings, and moved to Alasehir to start anew with no money and no shelter.

> My nephew was 9 months old when the earthquake happened and he was very sick because we slept outside and he was hospitalized. John [ ] is the one who sent our baby's clothes and medicine to our house. My nephew is attached with his help, we were able to establish a new living environment thanks to his help and support. He has been an invaluable help to my family and me during our most difficult times. He's a very helpful and big-hearted person.

Three letters that simply cannot be summarized are from John's mother, John's wife, and John's daughter.

"[I]f ever a man is to receive credit for the good he has done . . . it should be at the moment of his sentencing. *United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006).

Since his arrest on this matter, John has personally grown, albeit not without the inherent mental setbacks that plague those incarcerated and separated from their spouse and children. He has wept about his position in life, often when reflecting on the things he did that lead him to where he is. He has wept about the time he has missed, and will miss, in his children's lives. And he has wept at the thought of what he did to his adopted home. The letters attached to the PSR and the growth John has experienced this last year leave no doubt that, despite his crimes, John has always strived to be better and has enriched the lives of those around him. Those he has touched have neither forgotten nor abandoned him. That village will help John transition from the sentencing this Court must impose to a law-abiding life.

### 3. **Deterring Criminal Conduct and Protecting the Public**

A sentence of incarceration of no more than 46 months is sufficient to provide general and specific deterrence, to provide respect for the law, and to protect the public.

To start, the unique nature of the criminal conduct at issue in this sentencing and John's role in the steel trading business lessens the need for general deterrence. *Cf. Garofalo v. Gravano*, 23 F. Supp. 2d 279, 282 (E.D.N.Y. 1998) ("General deterrence is similarly inapposite. Because his stature in organized crime is so unique, it would be fatuous to believe that the sentence imposed would encourage others to emulate his past"). Simply put, sanctions violations are not common. Even for those in the population who could be deterred, the punishment already meted out to John — arrest by the FBI, pretrial detention under severe conditions, a felony conviction, public humiliation, an irreparable business reputation, personal ruin, damage to his children's psyche, and the safety and security threat to his family in the U.S. and in Turkey — already provides

significant deterrence. *See United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (holding that § 3553 "does not require the goal of general deterrence be met through a period of incarceration," and upholding district court's determination that probation and restitution provided adequate deterrence, despite an advisory range of 27-33 months imprisonment); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials).

In addition, there are other circumstances in this case that underscore a lengthy sentence of imprisonment is not necessary to deter John from engaging in similar conduct. For example, he is a first-time offender, and courts have observed that first-time offenders like John are statistically less likely to reoffend. *See, e.g., United States v. Williams*, 662 F. App'x 366, 377 (6th Cir. 2016) (affirming a below-Guidelines sentence because the sentencing court "was motivated primarily by [the defendant's] lack of criminal history and her low risk of recidivism"). And for offenders like John who have never been imprisoned, even for a short time in jail, can be "sufficient to impress upon [her] the seriousness of the offense and to deter others under similar circumstances." *United States v. Cull*, 446 F. Supp. 2d 961, 965 (E.D. Wisc. 2006). And offenders over the age of 40 "exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Hernandez*, No. 1:03-cr-01257 (RWS), 2005 U.S. Dist. LEXIS 10026 (S.D.N.Y. May 24, 2005).

As to general deterrence, studies have shown that a longer prison sentence is unlikely to have a specific deterrent effect. "[T]here is little evidence of a specific deterrent

16

effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 CRIME & JUST. 199, 201 (2013). A long prison sentence for John — who, as set forth above, has been a productive member of society and hopes to be again — is thus not necessary to adequately serve the goals of deterrence.

Lastly, neither imprisonment nor other forms of custody are necessary to protect the public from future crimes. John has learned to respect the law and understands the seriousness of his crime, which is why he has assisted the government and earned a 5K1.1 motion. Based on his lack of criminal history alone, John poses the lowest possible risk of recidivism. More importantly, as the letters attest, John has demonstrated genuine remorse and has learned the most difficult of lessons from this case. John presents no risk of reoffending, and any form of custody is wholly unnecessary to protect the public. *See United States v. Groos*, Case No. 06 CR 420, 2008 U.S. Dist. LEXIS 103705 (N.D. Ill. Dec. 16, 2008) (imposing a 60-month sentence for exporting dual use items to Iran and finding that the "harshest punishment should be reserved for cases where weapons or military technologies are at issue and where threat to national security is apparent").

It is clear from this comparison of cases that a variance from the applicable guideline range, in addition to the one provided for pursuant to the government's 5K1.1 motion, is appropriate.

4. **Providing Training Medical Care or Other Treatment**

The Court should recommend that John receive treatment for alcohol abuse. Accordingly, given the facilities available with programs to treat John, the family's

visitation plans, and other things, John respectfully requests the Court include the following statement in the Judgment:

> The Court recommends the defendant's placement at the Federal Prison Camp at Pensacola for programming (RDAP/First Step Act) and family visitation purposes. The Court finds the defendant is appropriate for a minimum-security facility and programming is needed.

5. **The Applicable Sentencing Guidelines Calculation**

The estimated Sentencing Guidelines calculation set forth in the plea agreement and is consistent with the PSR. The calculation of the Guidelines range is but a first step in the larger sentencing analysis but is not binding on the Court. *See Gall v. United States*, 552 U.S. 38, 49 (2007) ("The Guidelines are the starting point and initial benchmark but are not the only consideration."); *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Shaw*, 560 F.3d 1230 (11th Cir. 2009) (sentencing judges are afforded a wide latitude in fashioning an appropriate sentence). A district judge need not find "extraordinary" circumstances to impose a sentence less than that called for by the guidelines, because that would "come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Gall*, 552 U.S. at 47. Only a "sufficiently compelling" reason is necessary. *Id*. at 50.

John's adjusted offense level is 29 and he is in criminal history category I, equating to 87-108 months. Even after reducing John's sentence pursuant to the government's anticipated 5K1.1 motion, the applicable guideline range suggests a sentence greater than necessary in this case. The unwarranted sentencing disparities make that clear.

6. **Avoiding Unwarranted Sentencing Disparities**

A below Guidelines sentence would not create any disparity with the sentences imposed on those convicted of similar crimes, especially given the related case of Sergey

Karpushkin. To the contrary, imposing a lengthy sentence, let alone a Guidelines sentence, of incarceration on John would create significant disparities in treatment between similarly situated defendants. Courts routinely review "case law submitted by defense counsel demonstrating that many similarly situated defendants had received sentences shorter than the guidelines range applicable here," and then impose sentences below the Guidelines range. *Sarvestani v. United States*, Case No. 13 Cr. 214 (PGG), 2015 U.S. Dist. LEXIS 159491, at n.3 (S.D.N.Y. Nov. 25, 2015).

In *United States v. McGonigal*, Case No. 1:23cr16 (S.D.N.Y.) the Court sentenced the former FBI Special Agent in Charge of the Counterintelligence Division in New York to 50 months for conspiring to violate the laws of the United States, specifically 18 U.S.C. § 371.[3] The government dismissed the actual IEEPA, conspiracy to violate IEEPA, money laundering, conspiracy to commit money laundering charges, and lying to the government. McGonigal, who formerly hunted spies for the government, supplied information to a Russian oligarch and laundered the proceeds of his crime from banks in Russia to Cyprus to the U.S. A Justice Department official described McGonigal as someone who "violated the trust his country placed in him by using his high-level position at the FBI to prepare for his future in business…Once he left public service, he jeopardized our national security by providing services to [an oligarch], a Russian tycoon who acts as Vladimir Putin's agent." McGonigal used classified information he accessed

---

[3] McGonigal was charged with only one count – the same count as Karpushkin's Information – conspiracy against the U.S., in violation of 18 U.S.C. § 371. McGonigal was also facing separate federal charges in the District of Columbia. McGonigal's case was for more serious than John's case. Like John, the Department of Justice assigned the National Security Division to assist a U.S. Attorney's Offices in the S.D.N.Y and in the D.C.

because of his position in the FBI and used it to benefit an oligarch sanctioned as a result of Russia's 2014 conflict with Ukraine. The applicable guideline range was 57 to 71 months, but the statutory maximum made the range 57 to 60 months. But the Court found 50 months appropriate for an FBI agent who led the FBI's spy hunters and used classified information for personal benefit. Surely McGongical's acts place him on the more serious spectrum of these cases.

In another case involving a U.S. government official, *United States v. Cabelly*, 1:09-cr-278-JDB, a former U.S. State Department employee pleaded guilty to conspiring to violate IEEPA, specifically 18 U.S.C. § 371, because of working for the Government of Sudan, a sanctioned entity. Cabelly lied to the government about the nature of his relationship and provided Sudan sensitive information from the State Department. The Court imposed a sentence of 8 months.

But the downward variance is not just reserved for high-ranking government officials who are traitors to the United States. A variance is also justified when looking at sanctions cases that proceeded to trial.

In *United States v. Chichakli*, Case No. 1:09cr1002 (S.D.N.Y.), the defendant participated in an elaborate and sophisticated conspiracy with others to illegally purchase commercial airplanes, knowing full well that those purchases violated U.S. sanctions, and engaged in money laundering. A jury found Chichakli guilty of nine counts, consisting of conspiracy to violate IEEPA pursuant to 18 U.S.C. § 371, conspiracy to commit money laundering, conspiracy to commit wire fraud, and wire fraud. After trial, the Court sentenced Chichakli to 60 months, a variance from the guideline range of 87 to 108 months – the same as John's range. However, a 60-month sentence is below the

applicable guideline range in John's case if the Court does not exceed the government's 5K1.1 recommendation and does not vary downward.

In *United States v. Hazim Elashi*, Case No. 02-cr-52 (N.D. Tex.), the defendant was convicted after trial for conspiring to violate IEEPA, in violation of 18 U.S.C. § 371, violating IEEPA, giving false statements to government officials, and money laundering. Elashi was born in another country and came to the U.S., where he and his family used their business to support Hamas and engage in transactions with a terrorist, who the U.S. had placed on the sanctions list. After trial, the Court sentenced Elashi to 60 months. However, a 60-month sentence is below the applicable guideline range in John's case if the Court does not exceed the government's 5K1.1 recommendation and does not vary downward.

In *United States v. Bahadorifar*, Case No. 1:21cr430 (S.D.N.Y), the defendant pleaded guilty to conspiracy to violate IEEPA and structuring financial transactions by making payments for an Iranian intelligence service to kidnap a dissident living in New York. The Court sentenced the defendant to 48 months. Here the Court imposed the sentence John now seeks. But surely a foreign adversarial government conspiring with those a defendant in the U.S. to kidnap someone in the U.S. who has sought asylum is far worse than John's case.

In *United States v. Gavidel*, Case No. 1:01cr417 (S.D.N.Y.), the defendant was convicted at trial for conspiracy to commit money laundering, money laundering, violating IEEPA, and structuring financial transactions. In sum, the defendant laundered and funneled drug money to Iran. After trial, the Court sentenced the defendant to 70 months. That sentence would be within the guideline range if the Court only grants a downward

departure to the extent the government requested. Laundering and funneling drug money to Iran is a far worse case.

In *United States v. Dhafir*, Case No. 03-cr-64 (N.D.N.Y.), the defendant was convicted of 59 counts of fraudulently using a charitable organization to launder money to Saddam Hussein's government and factions opposed to the U.S. intervention in Iraq and committed 25 counts of health care fraud. After trial, the Court imposed a sentence that was 60 months less than the low end of the guidelines and 141 months less than the high end of the guidelines. If nothing else, this demonstrates that Courts especially strive to avoid unwarranted sentencing disparities in sanctions related cases.

While there are cases with facts far more egregious that warranted more severe sentences, this sampling of cases show that the Court should vary downward when imposing John's sentence given the facts of his case and the related defendant's case. Only with a downward variance can the Court avoid an unwarranted sentencing disparity.

C.   **CONCLUSION**

Weighing the crime in this case against the truly extraordinary life John led according to the letters attached to the PSR, a below guideline sentence is more than reasonable. Even the U.S. Probation Office concluded factors justified a below guidelines sentence in this case. Analyzing the § 3553(a) factors as applied to John, a sentence of 46 months is sufficient but not greater than necessary to achieve the purposes of sentencing.

Further, John asks this Court to include in the Judgment:

The Court recommends the defendant's placement at the Federal Prison Camp at Pensacola for programming (RDAP/First Step Act) and family visitation purposes. The Court finds the defendant is appropriate for a minimum-security facility and programming is needed.

Respectfully submitted on April 10, 2024.

Respectfully submitted,

**Vincent A. Citro**
Florida Bar No. 468657
Primary Email: vcitro@losey.law
Secondary Email: docketing@losey.law
**Losey PLLC**
1420 Edgewater Drive
Orlando, Florida 32804
Telephone: (407) 205-8456
Counsel for John Can Unsalan

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 10, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

*Co-Counsel for Mr. Unsalan*:
Warren W. Lindsey via warren@lindseyferryparker.com
Matthew P. Ferry via matt@lindseyferryparker.com

*Counsel for the government*:
Chauncey A. Bratt via chauncey.bratt@usdoj.gov
Emma D. Ellenrieder via emma.ellenrieder@usdoj.gov
Sean O'Dowd via sean.o'dowd@usdoj.gov

Respectfully submitted,

**Vincent A. Citro**
Florida Bar No. 468657
Primary Email: vcitro@losey.law
Secondary Email: docketing@losey.law
**Losey PLLC**
1420 Edgewater Drive
Orlando, Florida 32804
Telephone: (407) 205-8456
Counsel for John Can Unsalan